**Emanuel FRIEDRICH, Petitioner–Appellant,**

v.

**Jeana Michele FRIEDRICH; David Harper; and Shirley Harper, Respondents–Appellees.**

No. 92–3117.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 13, 1992.

Decided Jan. 22, 1993.

assets to a creditor in no way diminishes the debtor's estate." *Id.*

Gary J. Gottfried (argued and briefed), Judy L. Fisher, Gottfried & Palmer, Columbus, OH, for petitioner-appellant.

Anthony Joseph Iaciofano (argued and briefed), Benjamin, Yocum & Heather, Cincinnati, OH, for respondents-appellees.

Before: BOGGS and SILER, Circuit Judges; and LAMBROS, Chief District Judge.[*]

BOGGS, Circuit Judge.

This is a case of first impression, requiring us to determine when the removal of a child from one country to another by one parent, without the consent of the other, is "wrongful" as defined by the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention") as implemented by the United States Congress in the International Child Abduction Remedies Act ("the Act"), 42 U.S.C. §§ 11601–11610. Emanuel Friedrich appeals from the denial of his petition for the return of his son, Thomas, to Germany. Thomas was removed from Germany to the United States by his mother, Jeana Friedrich, a few days after the Friedrichs informally separated. The district court found that Mrs. Friedrich did not wrongfully remove Thomas from Germany within the meaning of the Convention because at the time of removal Thomas was a "habitual resident" of the United States and Mr. Friedrich was not exercising his parental custody rights. For the reasons that follow, we reverse the district court's ruling and remand the case for a determination of whether, under German law, Mr. Friedrich had custody rights at the time of the removal that he was exercising or would have exercised but for the removal, and for consideration of any affirmative defenses that Mrs. Friedrich might raise.

I

In December 1989, Emanuel Friedrich married Jeana Friedrich in the Federal Republic of Germany. Mrs. Friedrich, a citizen of the United States, was a member of the United States Army stationed in Bad Aibling, Germany. Mr. Friedrich, a citizen of Germany, was employed on the military base as a bartender and club manager.

On December 29, 1989, the Friedrichs' only child, Thomas David Friedrich, was born in Bad Aibling. During 1990 and early 1991, Thomas lived with both of his parents in Bad Aibling off the military

---

[*] The Honorable Thomas D. Lambros, Chief Judge, United States District Court for the Northern District of Ohio, sitting by designation.

base. The Friedrichs' marriage was a rocky one from the start. Their first informal separation occurred in June 1990, but only lasted a weekend. The Friedrichs informally separated for a second time in March 1991. For the majority of this separation, Mr. Friedrich and his parents retained physical custody of Thomas. Mrs. Friedrich lived on the military base. In early May 1991, while still separated, the Friedrichs agreed that Thomas would accompany his mother on a ten-day visit to her parents' home in Ironton, Ohio. Upon Thomas's return to Germany, the Friedrichs reunited, and Thomas lived with both of them until late July 1991.

On the evening of July 27, 1991, the Friedrichs had a heated argument at their apartment. During the argument, Mr. Friedrich ordered Mrs. Friedrich to leave the apartment with Thomas and put most of their belongings in the hallway, including some of Thomas's toys. Mrs. Friedrich, however, did not leave the apartment until the next morning when she obtained assistance from friends in the United States Army. Together, they took Thomas and removed her possessions to on-base visiting quarters, where she lived with Thomas for the next four nights, until August 1, 1991. Mr. Friedrich did not interfere with the removal of Mrs. Friedrich's possessions or with the removal of his child. He explained that he was intimidated by the soldiers and wanted to avoid a scene in front of Thomas.

The on-base visiting quarters are not designed for permanent residence and the daily rate is expensive. Therefore, Mrs. Friedrich immediately sought alternative, less expensive accommodations. Under military regulations, Mrs. Friedrich could not live in the barracks on the base with her son. Mrs. Friedrich testified that she quickly concluded that she had nowhere to live with her son in Germany and that her only recourse was to return to the United States. In the late evening of August 1, 1991, without Mr. Friedrich's permission, consent or knowledge, Mrs. Friedrich left Bad Aibling en route to the United States with Thomas.

Between the time she left the family apartment on July 28, and the time she left Bad Aibling on August 1, 1991, Mrs. Friedrich met with Mr. Friedrich at least twice to discuss their separation and Thomas's welfare. On July 29, 1991, Mr. Friedrich visited with Thomas for four hours. On August 1, 1991, the Friedrichs planned specific times for Mr. Friedrich to visit with Thomas during the following week.

Mrs. Friedrich arrived in Ironton, Ohio on August 2, and initiated a divorce action in Lawrence County, Ohio on August 9, 1991. Although the court issued a Letter Rogatory to the appropriate German authorities, Mr. Friedrich claims that he never received the letter or any notice of the judicial proceedings in Lawrence County, Ohio. On August 11, 1991, Mrs. Friedrich returned to Germany without her son and immediately sought an emergency discharge from the United States Army. On August 28, 1991, the Lawrence County, Ohio, Court of Common Pleas issued a temporary order in favor of Mrs. Friedrich and ordered that Thomas not be removed from Ohio until further order of the court. On September 15, 1991, Mrs. Friedrich was discharged from the United States Army, and she returned to her parents' home in Ironton, Ohio.

Mr. Friedrich discovered that Thomas had been removed to the United States on August 3, 1991, and filed a claim in Germany seeking to obtain parental custody soon afterward. On August 22, 1991, a Municipal Court–Family Court in Rosenheim, Germany granted Mr. Friedrich parental custody of Thomas. Mrs. Friedrich did not receive notice of that judicial proceeding.

Mr. Friedrich filed this action on September 23, 1991, alleging that Mrs. Friedrich had wrongfully removed Thomas from Germany in violation of the Hague Convention on Civil Aspects of International Child Abduction. On January 10, 1992, the district court denied Mr. Friedrich's claim.

## II

■ The Convention on Civil Aspects of International Child Abduction was adopted by the signatory nations in order "to pro-

tect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble. The United States ratified the Convention on April 29, 1988. Germany is also a signatory nation to the Convention. Pursuant to Article 19 of the Convention and section 2(b)(4) of the Act, a United States district court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim. It is important to understand that "wrongful removal" is a legal term strictly defined in the Convention. It does not require an ad hoc determination or a balancing of the equities. Such action by a court would be contrary to a primary purpose of the Convention: to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.

Under the Convention, the removal of a child from one country to another is wrongful when:

a it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in subparagraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of agreement having legal effect under the law of that state.

Hague Convention, Article 3.

■ Under the Act, Mr. Friedrich has the burden of showing by a preponderance of the evidence that the removal was wrongful. 42 U.S.C. § 11603(e)(1). If Mr. Friedrich meets his burden, the burden shifts to Mrs. Friedrich to show 1) by clear and convincing evidence that there is a grave risk that the return of the child would expose the child to physical or psychological harm; Hague Convention, Article 13b, 42 U.S.C. § 11603(e)(2)(A); 2) by clear and convincing evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms"; Hague Convention, Article 20, 42 U.S.C. § 11603(e)(2)(A); 3) by a preponderance of the evidence that the proceeding was commenced more than one year after the abduction and the child has become settled in its new environment; Hague Convention, Article 12, 42 U.S.C. 11603(e)(2)(B); or 4) by a preponderance of the evidence that Mr. Friedrich was not actually exercising the custody right at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; Hague Convention, Article 13a, 42 U.S.C. § 11603(e)(2)(B).

Therefore, as a threshold matter, Mr. Friedrich must prove by a preponderance of the evidence that 1) Mrs. Friedrich removed Thomas from his "habitual residence," and 2) Mr. Friedrich was exercising his parental custody rights over Thomas at the time of removal, or that he would have exercised his rights but for the removal, under the law of the state of Thomas's habitual residence. If Mr. Friedrich meets this burden, Mrs. Friedrich may fall back on one of the four affirmative defenses. The district court held that Mr. Friedrich failed to prove both parts of the test. Instead, the court found that 1) Thomas's habitual residence was "altered" from Germany to the United States when Mr. Friedrich set some of Thomas's belongings out in the hallway on July 27, 1991, and 2) Mr. Friedrich "terminated" his custody rights when he "unilaterally expelled" Mrs. Friedrich and Thomas from the apartment. The district court did not reach the merits of any affirmative defenses.

### III

### A

■ The Convention does not define "habitual residence." Little case law ex-

ists on the Convention in general; no United States cases provides guidance on the construction of "habitual residence." The British courts have provided the most complete analysis. In *Re Bates*, No. CA 122.-89, High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989), the High Court of Justice concluded that there is no real distinction between ordinary residence and habitual residence. *Id.* at 10. The court also added a word of caution:

> "It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. The facts and circumstances of each case should continue to be assessed without resort to presumptions or presuppositions."

*Id.* (quoting Dicey & Morris, *The Conflicts of Laws* 166 (11th ed.)). We agree that habitual residence must not be confused with domicile. To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions.

Thomas was born in Germany to a German father and an American mother and lived exclusively in Germany except for a few short vacations before Mrs. Friedrich removed him to the United States. Mrs. Friedrich argues that despite the fact that Thomas's ordinary residence was always in Germany, Thomas was actually a habitual resident of the United States because: 1) he had United States citizenship; 2) his permanent address for the purpose of the United States documentation was listed as Ironton, Ohio; and 3) Mrs. Friedrich intended to return to the United States with Thomas when she was discharged from the military. Although these ties may be strong enough to establish legal residence in the United States, they do not establish habitual residence.

A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward. All of the factors listed by Mrs. Friedrich pertain to the future. Moreover, they reflect the intentions of Mrs. Friedrich; it is the habitual residence of the child that must be determined. Mrs. Friedrich undoubtedly established ties between Thomas and the United States and may well have intended for Thomas to move to the United States at some time in the future. But before Mrs. Friedrich removed Thomas to the United States without the knowledge or consent of Mr. Friedrich, Thomas had resided exclusively in Germany. Any future plans that Mrs. Friedrich had for Thomas to reside in the United States are irrelevant to our inquiry.

The district court appears to agree that before the argument of July 27, 1991, Thomas was a habitual resident of Germany. The district court, however, found that Thomas's habitual residence was "altered" from Germany to the United States when Mr. Friedrich forced Mrs. Friedrich and Thomas to leave the family apartment.

Habitual residence cannot be so easily altered. Even if we accept the district court's finding that Mr. Friedrich forced Mrs. Friedrich to leave the family apartment, no evidence supports a finding that Mr. Friedrich forced Mrs. Friedrich to remove Thomas from Germany; Mr. Friedrich was not even aware of the removal until after the fact. Thomas's temporary three-day stay on a United States military base did not transfer his habitual residence to the United States, even if it was precipitated by Mr. Friedrich's angry actions in a marital dispute. As a threshold matter, a United States military base is not sovereign territory of the United States. The military base in Bad Aibling is on land which belongs to Germany and which the United States Armed Services occupy only at the pleasure of the German government. *See Dare v. Secretary of Air Force*, 608 F.Supp. 1077, 1080 (D.Del.1985).

More fundamentally, Thomas's habitual residence in Germany is not predicated on the care or protection provided by his German father nor does it shift to the United States when his American mother assumes the role of primary caretaker. Thomas's

habitual residence can be "altered" only by a change in geography and the passage of time, not by changes in parental affection and responsibility. The change in geography must occur before the questionable removal; here, the removal precipitated the change in geography. If we were to determine that by removing Thomas from his habitual residence without Mr. Friedrich's knowledge or consent Mrs. Friedrich "altered" Thomas's habitual residence, we would render the Convention meaningless. It would be an open invitation for all parents who abduct their children to characterize their wrongful removals as alterations of habitual residence.

This is a simple case. Thomas was born in Germany and resided exclusively in Germany until his mother removed him to the United States on August 2, 1991; therefore, we hold that Thomas was a habitual resident of Germany at the time of his removal.

### B

■ The district court also found that Mr. Friedrich "terminated his actual exercise of his parental custody rights" when he "unilaterally" expelled Mrs. Friedrich and Thomas from his residence. We are doubtful that the evidence supports a finding that Mr. Friedrich *unilaterally* expelled Mrs. Friedrich and Thomas from the family apartment. It is undisputed that during the heated argument on July 27, 1991, Mr. Friedrich removed some and maybe even all of Thomas's toys from the apartment. Yet, Mrs. Friedrich and Thomas remained in the apartment through the night. Mrs. Friedrich was the one who actually removed Thomas from the residence and did so with the help of the United States Army.

Even if we accept the district court's finding that Mrs. Friedrich removed Thomas from Mr. Friedrich's residence only because she was forced to do so by Mr. Friedrich, we doubt that Mr. Friedrich terminated his custody rights. Mr. Friedrich continued to have contact with both Mrs. Friedrich and his child. Mr. Friedrich assisted Mrs. Friedrich in establishing quar-

ters on the base and helped her move Thomas's crib on to the base. On July 29, 1991, Mr. Friedrich visited his child for four hours. On August 1, 1991, Mr. Friedrich met with Mrs. Friedrich to discuss the future of their relationship and the custody of Thomas. Although they gave conflicting accounts of the meeting, both stated that plans were made for Mr. Friedrich to visit Thomas within the next week.

Under the Convention, whether a parent was exercising lawful custody rights over a child at the time of removal must be determined under the law of the child's habitual residence. Hague Convention, Article 3. We have determined that Thomas was a habitual resident of Germany when Mrs. Friedrich removed him to the United States. Neither the district court, nor either party on appeal, applied German custody law to the above facts. At oral argument, however, both parties agreed that German custody law is similar to American law. Under American law, custodial rights can only be terminated by judicial action, or by circumstances much more extraordinary than those presented here. We would be surprised if Mr. Friedrich's actions terminated his custody rights under German law, but we do not make that factual determination. Instead, we remand to the district court with instructions to make a specific inquiry as to whether, under German law, Mr. Friedrich was exercising his custody rights at the time of Thomas's removal.

### IV

■ Every family dispute has its own unique set of facts, and the case before us certainly is no different. However, there is a central core of matters at which the Hague Convention was aimed: situations where one parent attempts to settle a difficult family situation, and obtain an advantage in any possible future custody struggle, by returning to the parent's native country, or country of preferred residence. That is exactly what happened here. The rights and wrongs of the actions of the respective parents are not before us for disposition on the merits. But it is clear, as shown both by actions at the time and

by the subsequent strenuous course of this litigation, that both parents maintained a lively interest in their relationship with their child, Thomas.

Under such circumstances, the Hague Convention is clearly designed to insure that the custody struggle must be carried out, in the first instance, under the laws of the country of habitual residence, which is Germany in this case.

The affirmative defenses of Section 11603(e)(2) of the Act offer an opportunity, in extraordinary cases, for a court in the country of flight to consider the practical realities of the situation. However, it is the clear import of the Convention that in most cases the duty of that court, when the niceties of the convention are met, is to return the child to the country of habitual residence for resolution of the custody dispute under the laws of that country.

## V

For the foregoing reasons, we REVERSE the district court's denial of the petition and REMAND the case to the district court with instructions to determine whether, under German law, Mr. Friedrich was exercising his custody rights over Thomas at the time of the removal and to consider any affirmative defenses Mrs. Friedrich might raise.

THOMAS D. LAMBROS, Chief District Judge, dissenting.

For reasons set forth below, I believe the decision of the trial judge in denying the return of Thomas Friedrich to Germany should be affirmed. The trial judge's laudable efforts in seeking a voluntary resolution of the dispute over the child's custody and his determination that the mother did not wrongfully remove the child from Germany are compatible with the objectives and imperatives of The Hague Convention on the Civil Aspects of International Child Abduction.

The findings of fact made by the judge shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Fed.R.Civ.P. 52(a). I believe the trial judge's decision to deny return of the child to Germany is supported by the evidence produced at trial and is therefore not clearly erroneous.

Respondent testified, "[h]e threw everything I owned and my baby owned out of the house. There was nothing left in that house." Petitioner's testimony corroborates this:

Question: ... [with] regard to your asking her to leave, requesting her to leave, and removing her personal belongings and your son's personal belongings into the hallway outside the apartment. Did that occur?

Answer: yes, sir.

Focusing on the totality of the testimony given, there may be a dispute as to whether petitioner threw out respondent and her son however, the trial judge sitting as trier of fact, determining credibility of the witnesses and the value of testimony given, found that petitioner expelled the wife and child from the apartment and terminated actual exercise of his parental custody rights over the child. This finding by the trial judge is not clearly erroneous.

A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake had been committed. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511. I have no definite and firm conviction that a mistake has been made.

With regard to the treaty itself, Article 13 provides:

... the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that—*a* the person, ...

having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention....

In defining the rights of custody, Article 5 of the Convention includes rights relating to the care of the person of the child and the right to determine the child's place of residence. By expelling the child from the apartment, petitioner gave up his right to determine the child's place of residence which means that there was no right of custody to assert in the district court. Since there was no right of custody because petitioner gave it up, there was no breach of the rights of custody. Thus, removal was not wrongful under the terms of The Convention.

For these reasons, I believe the district court's decision should be affirmed.